# UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA, FORT MYERS DIVISION

| | |
|---|---|
| Phillip G. Bradshaw, Dean D. Richardson, ) | CASE: |
| Wayne L. Cleaveland Sr.; ex. rel. . . . . . . . . .) | 2: 04 -c v - 90 -FtM-29. SPC |
| Aggrieved Children & Families . . . . . . . . . . ) | **HABEAS CORPUS** |
| Vs. | **CLASS COMPLAINT:** |
| STATE OF FLORIDA: Department of ) | KIDNAPPING, UNLAWFUL |
| Children & Family Services, Department of ) | CONFINEMENT, TORTURE, |
| Health, Lee County Office of Sheriff, ) | Anti-Trust, Racketeering, |
| Fort Myers Police Department, Francis, ) | Larceny, Assault/Battery, |
| Gibbons, Michael Murphy, Howard Wright ) | Mutilation, Enslavement, |
| Deborah Studybaker, Robert Richmund, ) | DEPRIVATION OF RIGHTS |
| Beth Prather, James H. Seals. John S. Carlin,) | UNDER COLOR OF LAW, |
| Margaret O Stienbeck, Joyce Mueses, ) | Abuse of Process, Denial |
| Barbara LeGrand, Susan Graham, Amity ) | of Due Process, Perjury, |
| Rinderle, Pam Miller, Jill Turner, Susan ) | Malicious Prosecution, |
| Murawski, Sheryl Speilman, Ruth Cooper ) | Obstruction, Misprision |
| Center, Rossama Panjikaran, Denise ) | of Felony, DEFAMATION |
| Meyerholz, Catherine Larned, James Kolarik) | OF CHARACTER, FRAUD, |
| Frederick W. Schaerf, Donna (Shankin) ) | Mal and Misfeasance of |
| Bertolotti, Mike Gregory, Mark Richardson, ) | Government Function, |
| Mary Marotta, A.M. Lang, Charles Taggart, ) | CONSPIRACY & SEDITION |
| John McDougall, R. Thomas Corban, etc. . ) | **Trial before GRAND JURY on** |

**Title 42 USC 1985(3) proceeding requested.**

_Relator: Phillip G. Bradshaw, pro per, sui juris_

12530 S.E. 4th PL, Bellevue WA 98005

**RECEIPT #** IFP

**1 SUMMONS ISSUED**

i

# PARTIES

# 1

## PLAINTIFFS:

Age and economically disadvantaged Floridian children and families suffering, or in danger of suffering, loss of life, liberty, and or property through sham proceedings and monopolistic cottage industries under color of law, with request for assistance of the Office of the United States Attorney General or U.S. Attorney counsel, in the interest of aggrieved children & families as presented three families **ABC**:

A.    JJB, FMB, JIB, minor children, by, through and together with natural father Phillip Gregory Bradshaw: 12530 SE 4th PL, Bellevue WA 98005.

B.    Dean Delano Richardson, in the interest of TWR, SAR, RDR and DRR: P.O. Box 9364, Fort Myers FL 33902

C.    Wayne Lee Cleaveland, Sr., in the interest of BLC, WLC, and grandchild: 2316 Gish Lane N.E., North Fort Myers FL 33907

# 2.

## DEFENDANT:

STATE OF FLORIDA, represented by Attorney General, Charlie Crist (850) 487-1963, The Capitol, Tallahassee FL 32399-0250, regarding presented sample of (but not inclusive of Defendant class body as a whole) offenders:

a.)  The State of Florida, herein after "Defendant State of Florida" is the employer, or former employer of the below named defendants and (according to Section 13 of Article X of the Florida Constitution) is liable and responsible for damages for criminal acts performed by said defendants in their official and individual capacities as administrators and agents for the State of Florida and agencies of the State of Florida. Defendant State of Florida is the principal, which appointed and supervises below named (*and others too numerous to list*) agencies, administrators, agents and contractors of the State of Florida.

Defendant State of Florida is liable for the failure of elected officials Governor [Jeb Bush, The Capitol, Tallahassee FL. 32399], former Florida Attorney General Butterworth, the several District Attorneys (who all share equal responsibility for failure to prosecute public corruption, of which all have jurisdiction, including former 20th Judicial Circuit D.A. Joseph D'Alessandro for the Middle District of Florida), and perpetrator Judges with the  Florida Attorney General Butterworth, and the Florida Department of Law Enforcement to prosecute criminal actions of State officers, employees, service venders et. al. . . .

Defendant State of Florida is liable for Title 18 USC § 2340 TORTURE, in the Department of Children & Family Services use of, the Florida State Courts support of, and [FLORIDA DEPARTMENT OF HEALTH, 2727 Mahan Drive, Tallahassee, FL 32308] licensure of unscrupulous practices in granting of license to practice medicine to "Biological Psychiatrists", who have poisoned tens of thousands of people in Florida alone, causing disability by means of brain damage, which not only has caused injury to the economy in loss of production and waste of resources, but has also

caused irreparable deprivation of basic human rights to the pursuit of happiness, right to work and enjoyment of privacy from undue government interference by inflicted physical injury, pain, agony and mental suffering.

Defendant State of Florida is culpable for injuries and criminal actions of the Florida Department of Children & Family Services, 1317 Winewood Blvd., Tallahassee FL 32399.

Defendant State of Florida is culpable for deprivation of Sovereign inalienable rights (acknowledged in the United States Declaration of Independence, protected by the 14th Amendment of the United States of America and ratified by Article 1of the Florida Constitution) in the actions of the Quasi-Judicial Administrative Hearings[1], known as Juvenile Civil proceedings involving minors detained by the Florida Department of Children & Family Services, in the Circuit Courts of Florida, which abridge the right to life, liberty and property, and equal protection under the law, by fraud, unwarranted search/seizure, extortion, denial of due process, sentence before trial, disregard of facts, poisoning of children, and other violent acts.

The Defendant State of Florida is culpable for administrative scheme known as *Florida Rules of Juvenile Procedure*, adopted and revised by the Florida State Supreme Court, which effectively denies and prevents DUE PROCESS and Equal Protection under the Law.

---

[1] As defined by the Department of Justice.

b.)   Lee County Office of Sheriff, 14750 Six Mile Cypress, Fort Myers FL 33912, former employer of John McDougall, who not only failed to execute process on reported corrupt public officials, but also initiated the creation of the false report of the Bradshaw family, and was supervisor of Charles Taggart, who unlawfully confined Dean Richardson to aid in the kidnapping of the Richardson children.

c.)   The City of Fort Myers Police Department which has, in addition to refused to execute process on criminal activities of State employees, continued in Obstruction of Justice by barring the expression of grievances at the State Regional Headquarters at 2295 Victoria Ave, Fort Myers FL 33901, by issuing a trespass warning to stop the reporting of rape, fraud and medical abuse of women, children and families from reaching the DCFS District 8 Administrator Michael Murphy.

d.)   Francis Gibbons was the original DCF District 8 Administrator at the commencement of the actions complained of in this suit, and was directed by Governor Jeb Bush to correct her department, but instead she said all was done "legally", knowingly covering for criminal actions of the agency under her direction.

e.)   As the Florida Department of Children & Family Services District 8 Administrator, Mike Murphy is responsible for the denial of public access to free public services in the issuing of a trespass warning to prevent affiant Phillip Bradshaw from reporting criminal actions of his subordinates to him, and seeking information from the Agency for Health Care Administration (located on the third floor of 2295 Victoria Ave. in Fort Myers FL 33901) concerning the number of children ordered to be

medicated by Judge Carlin, for presentation to a Citizen Review Board formed of community leaders together with complaints against his administration. This same District Administrator Mike Murphy is guilty of Obstruction of Justice for covering for his staff before the inquiry of Falsified Records and other wrong-doings of the Department by the Inspector General's Office. As the employer of Michael Murphy, Defendant State of Florida is culpable for the crime of Misprision in failure to prosecute DCF workers who purposely endangered 13year old girl by violating natural fathers restraining order against 32yearold Ty Desharm, by arranging visitation at jail and foster placement.

f.)    In addition to the 12/25/96 Kidnapping of minor children and Unlawful Confinement father Dean Richardson, [arrest #96012106MM, as presented in District Court Case: 2:01-cv-8-FtM-29DNF] DCFS Investigator Howard Wright did on the 3rd day of January 2000, create a False Report and removed the Bradshaw children from their mother even though there was no evidence of abuse or neglect as defined by Chapter 39 of the Florida Statutes to warrant the intrusion of State involvement. Howard Wright now works as a Police Officer for the City of Cape Coral.

g.)    DCFS Attorney Deborah Studybaker has filed over 140 counts of Falsified Records in this case, and still continues to file falsified records, as for instance, the allegations in the Petition to Terminate the natural mother's Parental Right's in spite of the Ruling of the Higher Court, as indicated by Attorney Barbara LeGrande's Motion to Dismiss, heard July 8, 2002.

h.) DCFS Counselor Robert Richmund has committed perjury numerous times before the Court, and together with his Supervisors Joyce Mueses and Dwight Phipps formed Falsified Records.

i.) Beth Prather, a former esquire of the Juvenile Court, assisted in the scheme of sham proceedings by helping to silence parents from accessing the record of the Court in defense of their family. Beth Prather as the Court Appointed Attorney during the January 4, 2000 Dependency/Shelter Hearing before Judge James H. Seals, did not mention to the Plaintiff that he could ask for a continuance of 72 hours to prepare a written Defense, after only hearing the allegations for the first time before the Court, that a fair hearing could be held. Nor did Attorney Beth Prather inform the family of the Right to a Speedy Trial.

j.) Judge James H. Seals assumed guilt of the natural parents to declare the children as being in need of "services" in the absence of evidence supporting the false allegations of the Department, in the face of testimony that there was no abuse or neglect of the children as required before intervention by the State, and detained the children as witnesses for further interrogations and upcoming Hearings contrary of Section 17 of Article 1 of the Florida Constitution, while refusing to allow Defense. Additionally, in the individual and official capacity of Judge, James H. Seals has made rulings without the participation, or notification of parties suffering the action of the Court.

k.) Judge John S. Carlin purposefully and knowingly accepted perjury and Falsified Records to be brought before him, and did sign many false statements. Judge Carlin did willfully and wantonly with a malicious

intent, deny justice for the family, and Ordered the oldest child to be disabled with harmful psycho-tropic medications, without regard of Human Rights or safety.

l.) Margaret O Steinbeck, who was sent from Charlotte County to replace Isaac Anderson as Judge in the Juvenile proceedings of the 20th Judicial Circuit Court for the State of Florida, as participated in the denial of due process, obstruction of justice, drugging of children and Misprision of Felony.

m.) DCFS Family Counselor Supervisor Joyce Mueses, did oversee and sign falsified records in the malicious prosecution of the Bradshaw family, with the adverse result of separating the family.

n.) Esquire for the Court, Barbara LeGrande has participated in obstruction of free access to the Court and Record of those processed by the Juvenile Court and is a principal, thereby, in the organized criminal action of kidnapping, extortion, fraud, and genocide under color of law.

o.)  Susan Graham, together with the Guardian Ad Litem Attorney Lori Tomaselli, 2000 Main Street, [#]200, Fort Myers FL 33901, has assisted in the defamation and mental torture of children through misrepresentation and malicious intentions.

p.)  Child Protective Services employee Amity Rinderle operates in the creation of false allegations for the facilitating of removal of children from families.

q.)   Child Protective Services employee Pam Miller operates in the creation of false allegations for the facilitating of removal of children from families.

r.)   Child Protective Services employee Jill Turner operates in the creation of false allegations for the facilitating of removal of children from families.

s.)   Child Protective Services employee Susan Murawski operates in the creation of false allegations for the facilitating of removal of children from families.

t.)   FOSTER AMERICA Psychiatrist Sheryl Speilman seduced (at that time 11 years old) JJB to accept the use of psycho-active medications as harmless, beneficial, (*magic bullet*) that would do what ever he wanted it to do, without informing him of detrimental effects or dangerous side effects, nor of the facts that none of the suggested line-up of drugs have shown any beneficial effects for patients subjected to "treatment", and that none of the drugs have been approved as safe in extended use, let alone approved for children by the FDA.

u.)   The RUTH COOPER CENTER, 2789 Ortiz Avenue, Fort Myers FL 33905-7806, assists in the use of Medicine and other "treatments", for the penalization of non-cooperative children detained by the State under color of law.

v.)   Rossama Panjikaran Contributed to the Dependency and Delinquency of a Minor as an employee of Ruth Cooper Center, under contract with the Department of Children & Family Services, with wanton disregard of health and human safety, under a State issued license to practice Medicine, by prescribing a disabling "treatment" for JJB.

w.)  Denise Meyerholz, a Ruth Cooper Counselor, continued the defamation of the family with the circulation of unsubstantiated and false allegations at staff meetings, for the effect of supporting continuing "services", to be paid for by government funding.

x.)  Catherine Larned M.D. contributed to the Dependency and Delinquency of a Minor as an employee of Ruth Cooper Center, under contract with the Department of Children & Family Services, with wanton disregard of health and human safety, under a State issued license to practice Medicine, by prescribing a disabling "treatment" for JJB.

y.)  James Kolarik, a Psychologist on contract with DCFS assists the State in dividing families by misrepresenting facts, to the harm of families, before the Court, for the benefit of financial gain.

z.)  Frederick W. Shaerf M.D., Ph.D., P.A., 4048 Evans Avenue, suite 304, Fort Myers FL 33901, a "Biological Psychiatrist" on contract with Florida State Courts, in over 150 Cases, having a degree in hormonal excretions, cooperates with the State in the creation of false claims to discredit defendants, to facilitate denial of rights to equal protection under the law and access to the court.  After creating a false report on the affiant's mental capacity, with presumed and unsubstantiated allegations of purported (non-existent) conditions, the State licensed "doctor" recommendation to the Juvenile Court was for the most powerful neuroleptic medication available, without regard of the health, safety or life of the affiant.  Dr. Frederick W. Schaerf's only doctorate is in endocrinology, the study of the excretions of the endocrine gland.  His

x

main focus of research is in estrogen treatments for women (*estrogen has been known to cause cancer of the uterus and breast in women since its introduction to the market after WWII*).    He also prescribed a combination of Ritalin and Risperdal to control SAR a minor child detained by DCFS in Fort Myers Florida.

aa.)    Donna (Shankin) Bertolotti, 14071 Cemetery Rd, Fort Myers FL, 33905 on contract with the State of Florida for the foster placement of the Bradshaw children, has aided the scheme of sham proceedings of the Juvenile Court by committing perjury before the court, and has harmed the children by neglect, unsanitary conditions, mental cruelty, theft and destruction of property ($10,000,000 original and only draft of words and music), and deceit.

bb.)    Mike Gregory who, in his individual and official capacity as a State employee, took 1year old BLC from her father without probable cause, under color of law, also refused to obey court order to promptly return the child to her father (upon the finding that he did not know the home address of the alleged unkempt house), and when forced through high-handed political pressure, did make threat of retaliation, which he fulfilled in changing (falsifying through alteration) the court ordered police assistance in granting custody of WLC Jr. to his natural father, while operating in his individual and official capacity in the Domestic Violence unit of the Lee County Justice Center, 1700 Monroe St. Fort Myers FL 33901.

cc.)    DCFS Protective Investigator Mark Richardson kidnapped BLC under color of law, in his individual and official capacity as a State employee,

and threatened the child, that her father would get 5 years in prison, if she tried to return home to him.

dd.)   Judge R. Thomas Corbin (per sworn affidavit of victim Wayne Cleaveland) threatened the natural father of BLC, Mr. Cleaveland, with 5 years imprisonment and tried to penalize Mr. Cleaveland with arbitrary financial burden of various classes, cottage industry beneficiaries of the court, which would have cost $1500 to attend, when Mr. Cleaveland was not even charged with a crime.

ee.)   Dianna Gilkerson is the Director of Operations for the Department of Children & Family Services in district 8.

ff.)   Eugenie Rehak is the Florida DCFS district 8 Chief Legal Counsel.

gg.)   Mary Marotta, DCFS Protective Investigator that processed secret filings (process without service to unwitting natural father) and false report to arrange the kidnapping of his children.

# Table of Contents

Cover:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  i

List of Parties:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ii

Table of Contents:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  xii

Table of Citations:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .xiv

Table of Issues:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  xvi

Jurisdiction:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . xvii

Federal Questions for Certification:  .  .  .  .  .  .  .  .  .  .  .xix

Legal History of Presented Cases:  .  .  .  .  .  .  .  .  .  .  .  xx

Table of Class Allegations:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . xxii

Common Complaints of Class:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 1

**I**. Search and Seizure:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 1

    A. JJB, FMB, JIB:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 3

    B. Unlawful Confinement:  .  .  .  .  .  .  .  .  .  .  .  .  .  . 5

    C. Double Jeopardy:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 6

**II**.    Malfeasance of Government Function:  .  .  .  .  .  .  .  . 7

a.) Torture: "Psychiatric Treatment"

    A. Rendering:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 9

    B. Restraint:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 12

    C. Poison:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 12

**III**.    Malicious Prosecution:  .  .  .  .  .  .  .  .  .  .  .  .  . 13

a.    Abuse of Process:  .  .  .  .  .  .  .  .  .  .  .  .  .  . 13

b.    Defamation of Character:  .  .  .  .  .  .  .  .  .  .  . 13

    A. Bradshaw:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 14

    B. Richardson:  .  .  .  .  .  .  .  .  .  .  .  .  .  . 18

    C. Cleaveland:  .  .  .  .  .  .  .  .  .  .  .  .  .  . 20

Summary:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 21

Argument:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 22

**I**. Fundamental Error:  .  .  .  .  .  .  .  .  .  .  .  .  .  . 22

    1. Definitions of Law:  .  .  .  .  .  .  .  .  .  .  .  . 22

    2. Constitutional Standard of Review:  .  .  .  .  .  .  . 24

    3. Citations:  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . 25

**II.** Malfeasance of Government Function:  .  .  .  .  .  .  .  . 29

    1. Cruel and Unusual Punishment:  .  .  .  .  .  .  .  . 30

    2. Standard of Review:  .  .  .  .  .  .  .  .  .  .  .  . 30

    3. Citation of Authority:  .  .  .  .  .  .  .  .  .  .  . 30

4. References: . . . . . . . . . . . . . . . . . . . . . . . 31

5. Assault/Battery: . . . . . . . . . . . . . . . . . 32

6. Definition: . . . . . . . . . . . . . . . . . . . 32

7. Famous Citations: . . . . . . . . . . . . . . . . 33

**III.** Malicious Prosecution: . . . . . . . . . . . . . . . . 34

1. Citations of Authority: . . . . . . . . . . . . . . 35

Conclusion: . . . . . . . . . . . . . . . . . . . . . 38

Certificate of Service: . . . . . . . . . . . . . . . . 37

Appendix: . . . . . . . . . . . . . . . . .     attached to back of brief.

1. Dean Richardson Affidavit: . . . . . . . . . . . . 6 pages

2. Wayne Cleaveland Affidavit: . . . . . . . . . . . 10 pages

# Table of Citations

**I.    THE CONSTITUTION OF THE UNITED STATES OF AMERICA**

1. Preamble: . . . . . . . . . . . . . . . . . . . . 24

2. 4th Amendment: . . . . . . . . . . . . . . . . . 24

3. 5th Amendment: . . . . . . . . . . . . . . . . . 24

4. 13th Amendment: . . . . . . . . . . . . . . . . .25

5. 14th Amendment: . . . . . . . . . . . . . . . . .25

# CASE LAW

1. _Accardo_ v. _Cenac,_ 722 So 2d 302, 97 23020 (La. App. 1 Cir. 11/6/98)

2.    *Adams* v. *Metropolitan Life Ins. Co.* 139 SW 2d 1098

2.    *Boyd* v. *US*, 116 US 616

3.    *Carson* v. *Elrod*, 411 F Supp 6445, 549 DC Ed VA (1976)

4.    *Cooper*, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980)

5.    Delaney, 617 P 2d 886, Oklahoma (1980)

6.    *Doe* v. *Irwin*, 441 F Supp 1247; U.S. D.C. of Michigan, (1985).

7.    *DCFS* v. *D.N.*, Case No. 2DCA: [#]2D03-844

8.    *Elrod* v. *Burns*, 96 S Ct 2673; 427 US 347, (1976)

9.    *Gentry*, 369 NW 2d 889, MI App Div (1983)

10.   *Goss* v. *State of Illinois*, 312 F 2d 257, (1963)

11.   In re K.C.C., 750 So.2d 38 (Fla. 2d DCA 1999)

12    *In RE: Peter*, 108 N.J 365, 529 A. 2d 419, 425

13.   *J.C. and W.B.C.*, v. *DCFSs, Appellee* (2D01-2198) 805 So. 2d 1094

14.   L.B., Appellant, v. DCF, Appellee. 835 So.2d 1189 (Dec. 30, 2002)

15.   *Mabra* v. *Schmidt*, 356 F Supp 620; DC, WI (1973)

16.   *Marbury* v. *Madison*, 5 US 137

17.   *Miranda* v. *Arizona*, 384 US 436

18.   *Murdock* v. *Penn*, 319 US 105

19.   *Norton* v *Shelby County*, 118 US 425

20.   *Owen* v. *Independence*, 100 S Ct 1398

21.   *P.G.B.* v. *DCFS* 2DCA: #2D00-5158

22.   *Rankin* v. *Howard*, 633 F2d 844, 451 US 939, 68 L.Ed 2d 326

22.   *Reynold* v. *Baby Fold, Inc*, 369 NE 2d 858; 8 Ill 2d 41

23.   *Santosky* v. *Kramer*, 102 S Ct 1388; 455 US 745, (1982)

24.   *Shuttlesworth* v *Birmingham* , 373 US 262

25.   *U.P.*, 648 P 2d 1364; Utah, (1982)

26.   *U.S.* v. *Throckmorton*, 98 U.S. 61

27.   *Wallace* v. *Jaffree*, 105 S Ct 2479; 472 US 38, (1985)

28.   *Welsch* v. *Likens* 373 F. Supp. 487

29.   *Yick Wo* v. Hopkins, 118 US 356, (1886)

# TABLE OF ISSUES

1.   Does the "judicial" practice of knowingly accepting contrived allegations, without requiring of supporting facts, to adjudicate jurisdiction and detain children, constitute conspiracy?

2.   Does the action of knowingly issuing of court orders without basis of law and facts, divest a judge of judicial immunity?

3.   Do repeated actions of the Department of Children & Family Services in lower courts violate 5th Amendment prohibition against Double Jeopardy?

4.  Since the principles, beliefs and practices of *Biological Psychiatry* are <u>not</u> based upon scientifically proven facts, does the relationship of government adoption, support, allegiance and enforcement of the beliefs of *Biological Psychiatry* violate 1st Amendment prohibition against respect of religion?

5.  Has the Florida Department of Health failed its ministerial duty to protect public interests of health and safety, in issuing license to practice medicine in the State of Florida to individuals utilizing known hazardous elements against the individual interests of victim "patients"?

# JURISDICTION

NOW COMES injured children and families in a diverse action against the State of Florida and State actors acting outside of the character of public office, in complaint of interstate and regional kidnapping under color of law. The amount in controversy is substantially in excess of Seventy Five Thousand Dollars ($75,000) exclusive of interests and costs.

This Title 42 USC § 1985(3) and 14141 Class Action for 42 USC §§ 241 and 242 deprivation of 13th and 14th Amendment rights of age and economically disadvantaged persons, in pursuit of 28 USC § 2241(a)(c)(3) and rule 81 writ of Habeas Corpus for parental custody of children, and 18 USCA § 2340 prosecution of torture, is brought into United States District Court for lack of remedy in state court, in that we have found the *Florida Rules of Juvenile Procedure* to operate as an administrative scheme; trial by jury is prohibited, proceedings are closed to the public, counterclaim is not allowed, evidence supporting of state allegations are not required to

adjudicate children dependent as wards of the state. Once adjudicated, the child remains under the jurisdiction of the court until age 18 or marriage, and the appellate court does not review original order of detention, therefore making declaratory relief unavailable in the state courts. Request for attendance and assistance of the United States Attorney General and/or U.S. Attorney for Title 18 USC § 2340 and Title 42 USC § 14141 action is hereby made for appropriate proceedings and protection of the class.

This action, commenced in the City of Fort Myers (Lee County) Florida, conferred upon this Court by Article III of the U.S. Constitution, Title 28 U.S.C. § 1651(a) and Federal Rules of Civil Procedure 81 [Title 28 U.S.C. § 2254 Rule 1(b)] is brought pursuant to remedy available through Title 18 USC § 1201 statute against kidnapping, Title 18 USC § 1951 statute against Racketeering, Title 18 USC § 876 statute against mailing threats, Title 18 USC § 1583 statute against slavery, Title 18 USC § 114 statute against maiming, Title 18 USC § 1505 against obstruction of justice, Title 18 U.S.C. §§ 241 and 242 for correction of conspiracy and deprivation of rights secured or protected by the Constitution or laws of the United States under color of law and Title 18, Part 1, chapter 55: kidnapping; for relief as granted through Title 42 U.S.C. § 1985(3) civil action for deprivation of rights and Title 42 U.S.C. § 14141(a) Unlawful Conduct:

**CAUSE OF ACTION:**

"It shall be unlawful for any government authority, or any agent thereof, or any person acting on behalf of any governmental agency to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that

deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."

Request for review of basic issues of constitutionality of Florida State Juvenile Court actions against the interest of the family is hereby made in pursuit of setting aside all judgments and orders made in said action, for reunification of the children with their father, without encumbrance of restrictions of liberty or prosperity.

Walter Van Dyke, Special Assistant U.S. Attorney for U.S. Circuit Court for California; "if the litigation be collusive . . . the judgment recovered may be set aside or its enforcement restrained" Opinion of Court delivered by Justice Miller:

*65. "There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents and even judgments." [*U.S.* v. *Throckmorton*, 98 U.S. 61]

### FEDERAL QUESTIONS FOR CERTIFICATION:

**Does an Article III court, any inferior court, any branch of American government, any agency or anybody either individually or by official capacity have authority to deprive any person of life, liberty, property or equal protection under the law?**

1.   Does the Florida Supreme Court have authority to adopt rules, which are primarily substantive in nature, against the constitutional rights of the people?

2.    Does the State Legislature have authority to deny any person of life, liberty, property or equal protection under the law, without due process of law?

3.    Does any person, profession, institution, state agency or employee thereof, have authority to deny any person of life, liberty, property or equal protection under the law, without due process of law?

# LEGAL HISTORY OF PRESENTED CASES

**A.** Proceeding from the Juvenile Division of the State of Florida 20th Judicial Circuit Court in Lee County Florida, lower court case 00-016-ABC-CJ-K2, in midst of second appeal of same controversy commenced January 4th 2000 before Judge James H. Seals, comes the natural father, Phillip Bradshaw, in the interest of his three children JJB, FMB, JIB, having found by exhaustive search and application, that declaratory relief/remedy is not available in state courts, by evidence of refusal of Florida Supreme Court to act on Petition for Writ of Habeas Corpus, SC03-802, filed 5/16/2003 and sent to offending lower court for ruling 5/22/03; dismissed 7/16/03 by Judge Margaret O. Steinbeck; appealed to the Second District Court of Appeals and acknowledged as Case: 2D03-3856, Initial Brief filed 8/4/03, uncontested by the Department of Children & Family Services but denied as a petition for writ of Habeas Corpus, yet treated as a full appeal by the 2nd District Court of Appeals and still pending while final judgment was issued on 2nd Termination of Parental Rights 1/21/04 and Notice of Appeal was filed January 23rd 2004.

The issue of lack of standing (legal grounds) on original adjudication of jurisdiction has been ignored by 20th Judicial Circuit Court Judge

Margaret O. Steinbeck, the Second District Court of Appeals, and the Supreme Court of Florida, as well as the complaints filed against the poisoning of the oldest son and the multitude of falsified records created by the prosecution. The petition is made for the return of the children to their natural father.

**B.** In the final proceeding from the Juvenile Division of the State of Florida 20th Judicial Circuit Court in Lee County Florida, lower court case file: [#]96-2079 was opened and finalized without proper service to Dean Richardson (the natural father):

1.    The proceeding began December 25th 1996 with unlawful confinement of the natural father [see U.S. District Court Case [#]2:01-cv-8-FtM-29DNF], abduction and adjudication of the children as dependent wards of the State of Florida without informing the natural father of allegations or showing warrant of probable cause, or notifying the natural father of the proceeding or transporting him from the jail to allow defense.

2.    The Order of Termination of Parental Rights was issued January of 2002, on default of the natural father, who was not informed of the time and place of the hearing, and was convalescing in a nursing home, after having suffered injury in an automobile accident.

3.    In addition to State intrusion upon economically and age disadvantaged children and families, it is alleged in this case that there was also discrimination on the basis of physical disability in assault and kidnapping under color of law.

4.    SAR was medicated by Frederick W. Schaerf M.D., Ph.D., with Risperdal and Ritalin with wanton disregard of her human rights and safety.

C. Proceeding from the Juvenile Division of the State of Florida 20th Judicial Circuit Court in Lee County Florida, lower court case [#]02-000948, BLC, who's location is at this time unknown to her father, Wayne Lee Cleaveland Sr., because (per DCFS report) she has escaped and is hiding out from them, has been ordered to be returned to her natural father, but the Court/department will not give her baby to Mr. Cleaveland, until 13 year old mother (BLC) makes an appearance in Court.

Mr. Cleaveland is concerned about the health and safety of his children, and does not trust the department in their assertion that they do not know of the whereabouts of his daughter.

# TABLE OF CLASS ALLEGATIONS

1. *We the People* allege that the *State of Florida* is operating in Sedition against Section 4, Article IV right of the people to a republican form of government, without regard of the sovereign privileges and immunities of the people, abridging United States Constitution prohibition against unreasonable Search & Seizure by:

a.)    Title 18 USC § 241 Conspiracy against rights;

b.)    Title 18 USC § 242 Deprivation of rights under color of law;

c.)    Title 18 USC § 1201(a)(1) Kidnapping;

d.)    Title 42 USC § 14141 Unlawful Confinement;

e.)    Title 18 USC § 1583 Enslavement.

2. In addition to the foregoing, *We the People*, allege that the *State of Florida* is operating in Malfeasance of government function in:

a.)     Title 18 USC § 2340 Torture;

b.)     Title 15 USC § 1 Anti-Trust Racketeering;

c.)     Title 18 USC § 1951 Extortion;

d.)     Title 18 USC § 114 Maiming;

e.)     Title 18 USC § 4 Misprision of Felony.

3. In addition to the foregoing, *We the People* allege that the *State of Florida* is engaging in Obstruction of Justice and Malicious Prosecution (of parties not charged with a crime) in simulation of legal process (under color of law) by:

a.)     Fraud;

b.)     Abuse of Process, [including proceeding without jurisdiction];

c.)     Title 18 USC § 1202, threats by U.S. Mail;

d.)     Defamation;

e.)     Title 18 USC § 247, Obstruction of religious freedom, and

f.)     Denial of 14th Amendment mandate of Due Process.

# COMMON COMPLAINTS OF CLASS

## I. SEARCH AND SEIZURE

### a.) KIDNAPPING UNDER COLOR OF LAW

*We the People* (aggrieved Children & Families), allege that the State of Florida has committed abduction and detention of vulnerable persons without warrant of probable cause, under color of law, by employment of law enforcement, power of the court, fraud and extortion. Although, there has been and are Cases of abduction, maltreatment, and death by abuse and neglect of the elderly and "incapacitated" under the jurisdiction and "care" of the Florida Department of Children & Family Services, the complainants in this action are filing in regards to tortuous actions against children. As a class of people suffering deprivation of human rights as age-based discrimination (pedism), children are in need of special recognition as vulnerable members of society that cannot defend themselves, but are totally reliant upon the moral protection of the society in which they live. As people of color have been preyed upon by unscrupulous and morally demented people in times past, requiring protection from racism, and women have suffered traditionally as weaker members of society, prompting the passage of laws protecting them from sexism, children are in need of protection from pedism: the unwillingness of "society" to respect the basic human value and dignity of a person, regardless of his or her age and/or physical development.

C.A.P.T.A., the Child Abuse Protection and Treatment Act of 1974, was introduced to mandate, fund and establish guidelines for family preservation and ultimately for the protection of children from abusive situations; However, together with the generous funding made available for State intervention for protection of children, came also the vulnerability of the federal funding to fraud. While, as

1

members of the greater class of citizens of the United States, *We the People* (aggrieved children & families of Florida) are defrauded as American taxpayers by taxation without representation, the focus of this action is not upon the economic damages suffered by the United States, but upon the injuries suffered by individual members of this Class Action.

The systematic generation of false claims (allegations) by a government agency, under color of law, for the purpose of exploitation of vulnerable citizens might have been considered shocking and most reprehensible, if it weren't for the facts that follow. False imprisonment of a father to facilitate the removal of his children; strip searches and psychological debriefing/memory planting; debasing of children under the guise of providing "services"; and usurpation of total security, autonomy and integrity of a family to assume State *parens patriae* power over every detail of a family's existence is in direct opposition of all the basic principles of liberty and freedom that is guaranteed by our United States Constitution. The 14th Amendment prohibition against State abridging of the privileges or immunities of citizens of the United States, and prohibition of State deprivation of any person of life, liberty, or property without due process of law and the protection afforded to any person (every person) of equal protection under the law, also backs the 13th Amendment prohibition against slavery in condemning the State holding of persons (or families) as property (slaves).

As representatives of the Class of aggrieved children and families, we allege, and show by examination of our individual experiences, that beyond our individual circumstances, there is a pattern of systematic deprivation of rights under color of law, involving an administrative scheme that is carried out in bad faith, without regard of human rights or safety, in the kidnapping of our children:

2

1.    Allegations are received against the life, liberty and property interests of victim families without question by State Investigators.

2.    Children are abducted, under color of law, without warrant of probable cause.

3.    Parents are denied normal protections of DUE PROCESS, like the right to a trial by jury.

4.    Judges do not require facts supporting intervention for protection of children before adjudication of dependency, proceeding without jurisdiction.

5.    False witnesses are hired (Psychologists, Psychiatrists) to convert hearsay into evidence.

6.    Guardian Ad Litem "volunteers" are utilized to simulate representation of the children in court, but do not relay requests or defend the interests of the children to be returned home.

7.    Separate Petition to Terminate Parental Rights is utilized to prevent original adjudication of detention from coming to trial for fair hearing or for review by higher court of appeal.

8.    Children that do not comply with the authority of the department are penalized with psycho-active medications that are disabling and deprivation of their basic human rights.

# CASE STUDIES

**A.    JJB, FMB, JIB MINOR CHILDREN DETAINED BY DCFS.**

1.  While the natural father was out of town, at 3:00 a.m. January 3rd 2000, in a luxurious waterfront, fully stocked 4bedroom resort accommodation, Law

Enforcement from the Lee County Sheriff's Office entered upon the awakening of minor children and informed the children and their mother of criminal actions of three young men who had been supplying payment for the accommodations, for the previous month. The children were first given information then asked to repeat it and give their thoughts about it, and then the police wrote down interpretations of what was said, rather than what was said.

2.    The children (as young as age 4) were asked bizarre questions about death, suicide and sex, while forcibly separated from the protection of their mother.

3.    In lower case 00-16, JJB, FMB and JIB were adjudicated dependent 1/4/00, less than 24 hours after their abduction (without service of allegations to their parents or an opportunity to prepare or give a defense) By Judge Seals in the Juvenile Division of the Circuit Court, in the 20th Judicial Circuit, in Fort Myers Florida, in-spite of the fact that 4 State Investigators testified that there was no sign of abuse or neglect of the children.

4.    Judge Seals ordered a separation of the family, and commanded that there be no communication between the children and parents of phone numbers, court proceedings, or any other kind of communication outside of 1 hour supervised visits within the guarded closed doors of the Regional State Offices of the Department of Children & Family Services at 2295 Victoria Ave. Fort Myers FL 33901.

5.    The children were forced to be in unfavorable conditions where there was no natural care, and their clothes were mocked and taken away. They were forced to be in vulgar settings, poorly clothed unto being made sick, subjected to

4

toxic fumigation and poor nutrition, and an original manuscript, worth ten million dollars, of words and music was stolen by Donna Shankin Bertollotti, according to her own confession, and within 4 months all communication was stopped and even the protection of the older brother was removed from the only daughter.

6.    Notice of Error on Original Adjudication: Judge Seals based ruling, not upon allegation of abuse or neglect, but presumption of guilt on charges not filed, let alone presented for trial.

**B.    UNLAWFUL CONFINEMENT & CHILDREN DETAINED UNDER COLOR OF LAW.**

1.    In 1994, Case # 94-311 regarding the foster placement of TWR, SAR, and RDR in the Baptist Children's Home by HRS (now called DCFS), before judge Starnes, without informing the natural father of the proceedings.

2.    After retrieval of his son to prepare for the family move to Minnesota, a false report was made by DCFS Protective Mary Marotta, and filed as a new Case # 95-1457 on the 5th day of June 1995, with the help of Child Welfare Legal Services Attorney A.M. Lang, without ever interviewing the natural father or informing him of the proceedings.

3.    On the 7th day of June 1995, Judge Seals dismissed the former Case #94-311, and set a Hearing date for Case #95-1447.

4.    Hearing was held without notice served on natural father, although he stayed in constant touch with his daughters in the Baptist Children's Home, and the department had his address.

5.    Under color of law, a pickup order was issued, and TWR was abducted from school in Minnesota and transported to Florida without notice to the natural father of any of the proceedings.

6.    After suffering the ultimate distress of his son not returning home from school, and realizing that foul play could be involved, the father contacted the Sheriff's Office to report his son missing, only to be told that his son had been taken to Florida, and there wasn't anything that could be done about it.

7.    In 1996 TWR was returned to Dean Richardson, the natural father, and he also removed DRR and SAR from the Baptist Children's Home, without ever being informed of the earlier proceedings.

8.    On Christmas night of 1996, DCFS Investigator Howard Wright had Dean Delano Richardson incarcerated without cause (arrest [#]960121006MM) [see U.S. District Court Case [#]2:01-cv-8-FtM-29DNF], for the sole purpose of taking all four children as wards of the state, and Case #96-2079 was opened without informing, or transporting the natural father from the Lee County Jail to the Dependency Shelter Hearing held in the Lee County Justice Center.

C.    THE CASE OF BLC: BREACH OF THE DOUBLE JEOPARDY CLAUSE.

1.    In 1990, while seeking help in child-support collection, Mr. Cleaveland suffered the intrusion of government services, as HRS Mike Gregory took his 1year old baby girl (BLC) away from him, without warrant of probable cause.

2.    Although the judge threw out the Case, recognizing the futility of upholding the allegations contrived by Mr. Gregory concerning the assessment of Mr. Cleaveland's house-keeping, when he could not answer of record upon Mr.

Cleaveland's pro-se examination even the address of the home; the department ignored the Court Order to return the child, instead requiring the natural father to pay for and attend various classes, until Senator Connie Mack was contacted. The child was returned, but not without threat of further evil.

3.  In Case #02-000948, BLC, age 13, was taken from her father, Mr. Cleaveland, without warrant of probable cause by DCFS Investigator Mark Richardson, while Mr. Cleaveland was in the hospital after defending his daughter from an offending 32 year old, male neighbor, Ty Desharm.

4.  Although Cleaveland was not hospitalized overnight, and a DCFS approved "Safe House" contact was provided for care of BLC, if Mr. Cleaveland were to be held over-night, DCFS Investigator Mark Richardson, acting in his individual and official capacity, lied to Mr. Cleaveland, giving him a telephone number to call, saying he could pickup BLC in the morning, while confining BLC against her will, utilizing threats against her and her father to intimidate her.

5.  Mr. Cleaveland was released before nightfall, and called the number given to have his daughter returned, but instead was told faulty information to prevent his attendance of the Dependency Shelter Hearing scheduled for the next day.

# II.  MALFEASANCE OF GOVERNMENT FUNCTION

a.) **TORTURE**

BLACK'S LAW DICTIONARY SEVENTH EDITION:

Definition: torture; "The infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure."

This complaint of torture, filed on behalf of aggrieved children and families of the State of Florida against the State enforced disablement of children by assault and mutilation (in closed-head traumatic injury) of neurological synapse nerve endings, basal ganglia, extra-pyramidal side effects, heart, liver, and all other parts and functions of the body, through toxic substances (traditionally referred to as poisons) now called "psycho-active medications", is filed in pursuit of ending the government support/use of pretended medical knowledge to intimidate, penalize, injure, maim, kill or otherwise control the general population.

The attention of this action is drawn toward the basic goals and values established as the foundation of the American vision for Liberty and Justice for all, in the establishment of "One Nation, Under God, Indivisible with Liberty and Justice for All". Expanding realms of protection for government workers, to be immune from prosecution of crimes committed under color of law, is the establishing of a caste system whereby it is no longer government by *We the People, for the People*, but a farce of democracy, with a ruling class of people held above the law. Like the Social Nationalism of fascist Nazi Germany, where Psychiatrists were able to dictate who was unfit to live, according to their prejudiced views of *Eugenics*, Florida Department of Children & Family Service Investigators and Social workers have somehow taken hold of a measure of sovereign authority that once could only be issued by a King. To be able to make a false allegation, against a family, subject the children to strip-searches, beatings, mal-nourishment, denial of proper health care, malicious psychological battery, restraint, imprisonment, and torture by poison, all under the guise of helping the child, is now held as though it were a Constitutional right of the privileged government employee.

8

Like the failed policies of communist Russia, where an aristocratic ruling class monitored and controlled (oppressed) the poor general population as *"peasants"*, the inequality and burden of unjust government intrusion into the personal and private lives of the people is deprivation of the basic common rights enumerated in the Constitution of the United States and yet reserved by the people as the inalienable inherent rights common to all human beings.

The individuals named as Defendants in this instrument, are actually only a small portion of the entire cartel of state-wide participants in the abduction of children for profit scheme, which in addition to the initiating Department of Children & Family Services, also is added various other "service providers" as physicians, psychologists, psychiatrists, foster placements, guardian ad litems, courts, attorneys, and law enforcement, who all together affect tens of thousands of children a year, proportionally, as indicated in the AHCA report of year 2000, by more than half of the children being disabled by psychiatric "treatments" (*with approximately 30,000 children under the jurisdiction of the Florida Juvenile court system, and a 3 Billion dollar budget, 16,655 children on $9million dollars of Medicaid funding between the ages of two to eighteen were drugged with neuroleptic medication for "schizophrenia", with $4.8million spent on "Risperdal" alone*).

# CASE STUDIES

To show malfeasance of government function in the misappropriation and misapplication of medical science, the experience of these three families are again presented:

**A.      THE RENDERING OF JJB, FMB AND JIB.**

9

1.    Before the first attempt of Termination of Parental Rights 12/6/00, a Hearing was held to obtain permission to "medicate" JJB. In the absence of the natural father, the natural mother was told that her son was causing trouble at school and in the foster placement, and that it was desired by the placement (FOSTER AMERICA) that he be drugged, to slow him down for management purposes. The natural mother later expressed her concern to the natural father that she consented because she was afraid that JJB would be physically maimed in foster placement, if he were not sedated to keep him out of trouble.

2.    JJB was told to think of what positive effect the medication might accomplish for him. At no time were the son or the mother told of the severe side effects associated with consumption of the toxic substances.

3.    Another hearing was held, and the natural father exercised his biblical right to veto and over-ride his wife's uninformed consent, as the contract of marriage was agreed to on basis of Commandments, Precepts, and Statutes of the Holy Bible. The natural father cited health concerns as well as religious reasons why intoxication of his son was not permissible.

4.    Psychiatrist Sheryl Speilman told of some of the side-effects that would be risked in subjecting JJB to a battery of drug trials, and stated on the record that the purpose was restraint, like a "chemical straight jacket". Neither the Psychiatrist" nor the Judge considered the appropriate remedy of family reunification to address the agony of the child's desire to be returned to his father.

5.    Without informing JJB of the risks of the various drugs, it is alleged (but undocumented) that the Ruther Cooper Center assaulted the minor child with a

FDLE Investigators on 1/6/00 that "it" never happened, the Child Protection Team was still trying to instill a false memory four months later, with films and psycho-therapy, until the foster placement became tired of being bothered with the process.

9. Then, beginning in April of 2000, DCFS Counselor Robert Richmund told the children that their father did not care to see them or write them, or give them anything, as opposed to the truth that he refused to arrange visitation, and Judge Carlin terminated visiting rights based upon his false report, and no contact was permitted at all, which would mean that unless the order would be reversed by a higher court, the children would be left to believe that they had been abandoned by their father, that they had come from a bad family, and that they are genetically disadvantaged (according to DCF) and 18month old JIB would grow up only knowing of his natural father what was related through the adversarial system of the State foster system.

## B.    RESTRAINT OF SAR

1. On contract with the Florida Department of Children & Family Services, Frederick W. Schaerf M.D., Ph.D., P.A. prescribed a combination of Ritalin and Risperdal to control SAR, who was frustrating foster placement in her pursuit of liberty.

## C.    ATTEMPTED POISONING OF UNBORN CHILD BY DCFS:

1. Per report of BLC to her father, DCFS social workers never took her to the hospital for observance of pregnancy nor of bruises suffered from physical beatings suffered in foster placement. But pills were forced upon BLC, who

12

was pregnant at the time, and it is alleged that the department was attempting to terminate the pregnancy that occurred as a result of state "intervention".

*Fortunately BLC is among the 33% statistic of all persons subjected to "psychiatric treatment" that customarily hide and spit out the pill when the attendant is not looking.*

2.    Under the definitions of Torture; emotional trauma and extortion by threat should be noted of the malicious strategy of the DCFS Investigator telling the 13year old girl that if she tried to return home, she and her father would be incarcerated.

# III.  MALICIOUS (*BAD FAITH*) PROSECUTION

### a.)   ABUSE OF PROCESS (DEPRIVATION OF RIGHTS UNDER COLOR OF LAW)

*We the People* (aggrieved Children & Families), allege that the State of Florida has abridged our 14th Amendment rights, adversely affecting substantial life, liberty and property interests, without DUE PROCESS or equal protection under the law, by proceeding without establishment of jurisdiction by facts and law, rushing of judgment, obstruction of justice, restriction of access to the courts, fraud, delay, and BAD FAITH.

### b.)   DEFAMATION OF CHARACTER (FRAUD)

*We the People* (aggrieved Children & Families), allege that the State of Florida has utilized false witnesses to facilitate the deprivation of rights.  Specifically, the State of Florida is utilizing an exception of the hearsay rule, based upon a nontheistic religion (*humanism*), or system of beliefs (*Social Darwinism*) that is not scientifically based on observable facts but subjective impositions of notorious "*Biological*

13

*Psychiatrists*", to defame and indict children and parents as being "*in need of services*", against the best interests of the children and families.

# CASE STUDIES

**A. Lower court Case File:  00-16-ABC-CJ-JHS**

1.    JJB, FMB, and JIB, on the night of January 3rd 2000, were separated from their mother for questioning and allegations were created (later found by the Second District Court of Appeals to be unproven and without basis of fact or supporting evidence) to invoke the action of State intervention.  These same allegations were put forth to the staff of Ruth Cooper Center, and others, as though valid by DCFS, and these allegations were utilized as a basis of diagnosis and prognosis upon evaluation of the children and father (whom they never interviewed) and held contrary to observations of all (including Investigators) that the children were well-mannered, beautiful, healthy, well clothed, with-out any sign of abuse or neglect and "perfect for adoption".

2.    Ruling was made, by 20th Judicial Circuit Court Judge James H. Seals, without fair trial, on the basis of presumed allegations, without supporting facts, on January 4th 2000, less than 24 hours after abduction of the children, without written notice of allegations being afforded to the parents or opportunity to prepare a defense, cross-examine witnesses, or to defend the substantial rights of life, liberty and property of the family.

3.    Court appointed attorneys and a guardian ad litem were placed, not to defend family rights, but to "represent" the accused parent(s) and children, preventing the children and parent's access to the record, neither speaking in defense of

14

the family nor counseling of available rights and remedies, but working together with the prosecution to speed up the process of adjudication.

4.    Trial was set for 6 months after abduction of the children, and a decision was rendered 12/6/00 by Judge John S. Carlin, another 6 months after the "trial", which was reversed by the Second District Court of Appeals January 25th 2002, more than a full year later.

5.    Although Motions were set and heard for Judge Carlin to remove himself from presiding over any further hearings in this Case; he refused, and again issued orders for denial of visitation and to disable JJB with psychotropic chemicals.

6.    A new Case plan was produced by the department, without consideration of the civil rights of the family, which was presented as having Reunification as a possible goal, however there was no provision for visitation or communication with the children, but terms of probation/parole (voluntary submission to 24 hour supervision or unannounced inspections, financial audit, psychological and psychiatric observation, plus fees) were imposed upon the natural father, even though he was not charged with a crime or even as the offending parent in the proceedings.

7.    Judge John S. Carlin also refused the father's motion for State payment of a neutral Psychologist's fees, stating that if I wanted a second opinion, I would have to pay for it myself, and would first have to go to the contracted services already provided for.

8.    On rotation of judges, Judge Isaac Anderson was placed over the Juvenile Court in April 2002, but he set a 90day block for any motions to be heard.

9.  Judge Anderson struck all motions for reunification, return of stolen property, and for hearing on counterclaim, and even said that the United States Constitution did not apply to juvenile proceedings, but he did say that he would send all of the children to live with their Grandmother, as soon as the paper work was completed.

10. Judge Anderson was transferred to Port Charlotte Florida and Judge Margaret O. Steinbeck was sent from Port Charlotte to preside over Juvenile hearings in Fort Myers Florida.

11. Judge Margaret O. Steinbeck was petitioned for closing of the Case on the basis of lack of jurisdiction, but she ruled that since the children were adjudicated as dependent wards of the State, she had jurisdiction, even though original Order of Detention was not based on facts, nor requirement of law met for adjudicating minors as wards of the state.

12. 20th Circuit Court Judge Margaret O. Steinbeck was petitioned for guardianship to be granted to paternal grandmother of all three children, pending reunification with their father, citing Florida Statute stating relative care to be a priority in placement, but she deferred jurisdiction to the Probate Court, where it was ruled that Judge Steinbeck already had jurisdiction on placement of the children.

13. Paternal grandmother was summoned to appear in court during trial on Termination of Parental Rights, but when petitioned for flex funds to pay mileage on the 3,000 mile journey from Seattle to Fort Myers, DCFS Attorney Deborah Studybaker told defense that she would see to the transportation of State witness to trial, that it is the responsibility of the State to provide their

own witnesses, and afterward DCFS Counselor Robert Richmund called Seattle Washington and told paternal Grandmother Joanne Cisneros that she could appear by telephone, but at the pre-trial conference, Lori Tomaselli, the Attorney for the Guardian Ad Litem stated that her client did not consent to the grandmother's appearance by phone, and that a telephone appearance could only be arranged upon consent of all parties. Because arraignments would have had to be made in advance for a court supervised appearance by phone, no appearance could be possible on the day of trial. Although the grandmother is the current placement for JJB, the prosecution refused to acknowledge her as a party to the proceeding, and purposely blocked her appearance in order to defame her character in Court without her being there to defend herself.

14. Biological Psychiatrist, Frederick W. Schaerf, was hired to discredit the natural father, who stated in sworn testimony that he presumed the father to have a psychiatric condition because of the circumstances of his life, and that, although upon examination of the natural father he was "squeaky clean" of any symptom of psychosis, he found the natural father to be "paranoid", (mistrusting of the medical profession) and the only possible diagnosis to be "Bipolar", for which he prescribed "Clozaril" (*clozapin*). Upon cross-examination, Dr. Schaerf admitted that the drug had been taken off the market in the 60's, for being a cause of a number of deaths, and that the only criteria he could think of which would support his diagnosis of "Bipolar", was that he had to assume that I was not getting enough sleep. Testimony was introduced (including that of my former wife) that I sleep throughout the night, refuting the presumption of sleeplessness, which in its self would not warrant the risk of life-threatening application of clozapin {*tricyclic dibenzodiazepine derivative*; 8-chloro-11-(4-methyl-1-piperazinyl)-5H-dibenzo[b,e] [1,4]

diazepine}, which is only suggested for use by the manufacturer to prevent suicide.

15.   Because of the financial impedance of regular (at least 20 hours a week) necessitation of attending court hearings, preparing legal defense, and researching law and procedure, I have not been able keep a full-time job, thus reduced to below poverty-level wages of labor pools, and thus economically prevented from being able to hire a second opinion, but relied on facts to effectively refute the false witness of hired character assassin, State contracted Psychiatrist.  Unfortunately the juvenile court follows procedure, which over-looks facts inconvenient for the prosecution of victim families, to allow conversion of hearsay into "evidence" by determination of "expert witness".

16.   5 months after the 8/20/03 trial on parental rights, on the 21st day of the month of January, 2004 Judge Margaret O. Steinbeck advised all parties of her ruling terminating parental rights over the two youngest children, who were only 1½ and 4 years of age at their abduction, saying that they are suitable for adoption, whereas the oldest son (*who had to be removed from every foster placement found in Lee, Collier, and Charlotte Counties, per foster demand*) now enjoys a placement with his natural family in Washington State.  JJB, now 14 years old and 6' tall, exhausted every available foster placement in the 20th Judicial Circuit of Florida, and was not found desirable for adoption, to his good fortune, however he was penalized for his noncompliance with physical and psychological abuse of his body and mind.

## B. MALICIOUS PROSECUTION OF THE RICHARDSON FAMILY

1.  In 1994, Florida Department of Health and Rehabilitative Services (a.k.a. DCFS), opened a file (94-311) on three of Dean Richardson's children, without service or notice of the proceeding to their natural father.

2.  On the 5th day of June 1995, false allegations were filed against the natural father, without any investigation, warrant, or service of complaint to the natural father, as Case 95-1457.

3.  Without any wrong-doing of the natural father, a pick-up order was signed for the abduction of TWR across State lines, under color of law, and TWR was kidnapped from Minnesota to Florida, without any process served on the natural father.

4.  Utilizing court appointed Attorney Barbara LeGrande to prevent Dean Richardson's access to the record, ex-parte proceedings were held in conspiracy to orchestrate deprivation of rights.

5.  On December 25th 1996, Dean Richardson was incarcerated for the sole purpose of facilitating the kidnapping of his children through the use of [Florida Statute 843.0855 prohibited] simulated legal process (*abduction under color of law*).  Dean Richardson suffered unlawful confinement in the Lee County Jail, and was not brought to the hearing in the Lee County Justice Center when his children were adjudicated dependent wards of the State of Florida, nor was he served notice of the Hearing or informed of the Hearing or allegations.

6.  The son, at age 14, was not found to be desirable for adoption, as the daughters were considered to be desirable, so the son was returned to his father, but the girls were kept as property of the State.

19

7.   In January 2002, without service or any manner of notice to the natural father, a Hearing was held without the father's presence, the father ruled in Default by Judge John S. Carlin, and all Parental Rights Terminated while the natural father was in a nursing home recuperating from an automobile accident, essentially without legal assistance or notification of proceedings.

8.   SAR fought for her freedom, so DCFS contracted Psychiatrist Frederick W. Schaerf  was paid to prescribe an "off-label" combination prescription of Ritalin and Risperdal to restrain her.

## C. ABUSE OF PROCESS ON THE CLEAVELAND CASE

1.   In 1990, while seeking economic assistance as a single parent for his 1year old daughter BLC, Wayne Lee Cleaveland Sr. suffered the removal of his baby girl, without warrant, by HRS (a/k/a DCFS) Protective Investigator Michael Gregory, whose action was committed in his individual and official capacity as an employee of the State of Florida child protection agency, through the use of simulated legal process, under color of law.

2.   Because Mr. Cleaveland proceeded without a court appointed attorney, he was permitted to cross-examine the false sworn testimony of HRS Investigator Michael Gregory, and expose the impossibility of said investigation of Mr. Cleaveland's home, because Mr. Gregory did not even know the address.

3.   Although the department was ordered by the court to return the child, the father was still told by the department to pay for and attend various classes, and did not comply with the court order until intervention by U.S. Senator

Connie Mack.  BLC was returned to her father, but not without malicious threat of further evil against the family.

4.    In 2002, after suffering an assault in protection of the virginity of his daughter from a 32 year old male neighbor Ty Desharm, who the police said they could not put a restraining order against until he had approached 13 year old BLC a second time, Wayne L. Cleaveland Sr. was approached by DCFS Investigator Mark Richardson, who took BLC under false pretenses, against the will of the natural father, under color of law, through the use of simulative legal process.

5.    Both the father and the daughter were threatened with incarceration, if they did not comply with the demands of the State.

6.    Misinformation was supplied to the natural father to prevent him from attending hearings.

7.    After 9 months, 13year old BLC was returned, 7 months pregnant.  But the next day malicious prosecution began for payment of child support, beyond amount actually owed.

# SUMMARY OF ARGUMENT

This lawsuit against kidnapping, torture, mutilation, genocide and other acts in deprivation of rights under color of law through use of simulated legal process, is filed in appeal for basic human rights and a constitutional form of government. *We the People*, aggrieved children & families, allege by facts of record that the operation of the State of Florida in administration of the Department of Health, the Department of Children & Family Services, Courts and Law Enforcement is in gross malfeasance

of government function, and is in Sedition against the laws of the United States of America.

# ARGUMENT

## I.    ABUSE OF DISCRETION OF THE COURT [FUNDAMENTAL ERROR]:

*We the People*, aggrieved children & families, hereby allege that the discretion of the Courts, and power of state government has been abused, in substantial loss and injury of basic human rights; that in the interest of public safety and domestic tranquility, a ruling may issue in remedy of injuries, that we may enjoy the relief afforded by a constitutional form of government.

## 1.  DEFINITIONS OF LAW

Now comes the natural father in the protection of the sanctity, sovereignty, and integrity of his family in the exercise of "a common right, which is not subject to interference or regulation by government" *Meister* v. *Moore*, 96 US 826, stating that the collection of Federal funding contrary to the guidelines thereof is a form of taxation without representation otherwise known as "Tyranny". The definitions of the intent/goals and purposes of the law are as follows:

a.    The requirements for funding of "child welfare services" [Title 42 U.S.C. Sections 601 et seq.] as requisite 622(b)(10)(B)(iii) a service program designed to help children (I) . . . return to their family from which they have been moved, have, in Section 625, the defined purpose of being for:

"public social services which are directed toward the accomplishment of the following purposes: (B) preventing or remedying, or assisting in the solution of

problems which may result in, the abuse, exploitation, or delinquency of children; (C) preventing the unnecessary separation of children from their families by identifying problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible; (D) restoring children to their families children who have been removed, by the provision of services to the child and the families".

b.      Purpose and intent of Chapter 39 in regards to Constitutional Rights:

**F.S.39.001(1)(l)**: To provide judicial and other procedures to assure due process through which children, parents, and guardians and other interested parties are assured fair hearings by a respectful court or other tribunal and the recognition, protection, and enforcement of their **constitutional** and other legal rights, while insuring that public safety interests and the authority and dignity of the courts are adequately protected.

c.      In regards to the Order of Dependency the natural father asserts that loss of liberty and other impositions upon life and liberty of the family are damages that warrant protection of the individual and corporate rights of the family.  Such protection is afforded by our Constitution (the contract *We the People* have established for the boundaries of government authority and power) and is in upholding of our **Sovereign Inalienable Rights**.

**Sovereign:**  A person, body or state in which Supreme authority is vested.  (The Supreme Authority formerly belonging to the King was vested in The People – freeborn Natural Persons, in the U.S. Constitution and Bill of Rights through a Republican form of government).

23

**Inalienable Rights:** Rights which are not capable of being surrendered or transferred without the consent of the one possessing such rights. [*Morrison* C State, Mo, App., 2422 SW 2d 97,101]

d.    Constitutional contract granting authority to governmental bodies and/or agencies prohibits acts of tyranny, or infringement upon basic rights inherently characteristic of free human beings.

## 2. Constitutional Basis of Contract:

a.) Introduction:

> We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and to secure the Blessings of Liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America.

b.)    The Basis of the contract, granted by representation of "We the People" for authorization of governmental powers, is to secure the blessings of Liberty by the promotion of the general welfare and by the establishment of Justice.

c.)    The 4th Amendment prohibits unreasonable searches and seizures.

d.)    The intent of the 5th Amendment was not to establish more rights for those charged with criminal offenses, but to secure the Rights of all people against loss of Life, Liberty, or Property by defining **Due Process** of Law. The protection against "DOUBLE JEOPARDY" clause is confirmed in Case Law in the doctrine of *"res adjudicata"*.

"In simple words, doctrine of '*res adjudicata*' means that every man is entitled to one day in court, one fair trial of his Case, and only one, and that no one shall be permitted to harass another or occupy the time and attention of the courts a second time for the same controversy". *Adams* v. *Metropolitan Life Ins. Co.* 139 SW 2d 1098

e.)   Section 1 of the 13th Amendment states:

> Neither slavery nor involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

The taking of children from their parents, without evidence supporting allegation suggesting the need for State Intervention, and then requiring monies paid for child support amounts to both subjecting the children into the position of cattle and putting the parent to involuntary servitude.

f.) The 14th Amendment confirms the assertion made in 5th by stating:

> .   .   . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or Property, without Due Process of law; nor deny any person within its jurisdiction the equal protection of the law.

## 3. RECENT CITATIONS OF AUTHORITY ON DCFS ABUSE OF COURT DISCRETION:

In addition to a father's right to raise his children, even in the absence of the mother; In re K.C.C., 750 So.2d 38 (Fla. 2d DCA 1999) found that children's need

25

for counseling due to anxiety over the separation from their parents did not support termination of parental rights.

In the Interest of F.M.H.B., J.J.B., and J.I.B., P.G.B. Appellant, v. Department of Children and Family Services, Appellee; 2DCA[#]: 2D00-5158, opinion filed December 28, 2001: . . . the elements required for termination were not found by clear and convincing evidence as required by law.

In the Second District Court of Appeal's February 1st 2002 ruling In the Interest of J.C. and W.B.C., children, A.L., Appellant, v. Department of Children and Family Services, [805 So.2d 1094], Judge John S. Carlin's decision to deny mother of any contact with her children in relative placement was found to be an abuse of the discretion of the court.

L.B., mother of A.M.S. and B.C.B., Appellant, v. Department of Children and Families, Appellee. 835 So.2d 1189 (Dec. 30, 2002): Mother sought review of order of Circuit Court, Duval County, John H. Skinner, J., terminating her parental rights. The District Court of Appeal, Lewis, J., held that: (1) finding that the mother's continued involvement with her children threatened their well-being or lives was not supported by clear and convincing evidence; (2) mother's parental rights could not properly be terminated based on prospective neglect or abuse; (3) Department of Children and Families has the burden of demonstrating that termination of parental rights is the least restrictive means of protecting children; and (4) termination of mother's parental rights was not the least restrictive means available to trial court.

In *DCFS* v. *D.N.*, Case No. 2D03-844, Opinion filed October 1, 2003 on appeal by DCFS and Sally Davies (G.A.L.) against Judge Isaac Anderson's Order for return of the children to their father:    In affirmation of the lower court's decision;

the Florida Second District Court of Appeals wrote to point out that it was the Department's (*the Department of Children & Family Services and the Guardian Ad Litem collectively*) refusal to respect controlling statutory authority that prevented the proper resolution of the case for over eighteen months.  The Second District Court of Appeals noted that; although the Department did not file a petition seeking to declare the two children dependent as to D.N., nor did the court declare the children dependent as to D.N., a case plan was approved in regard to S.N.  On October 12, 2001, D.N. filed a motion seeking to have the two children returned to him in Hawaii based on the Hawaii custody order and the Uniform Child Custody Jurisdiction Act (UCCJA), § 61.1302-.1348, Fla. Stat. (2001).  Florida's 20th Judicial Circuit Court Judge John S. Carlin denied the father's motion despite the clear statutory directive requiring the Florida court to defer to the Hawaii custody order.   During the remainder of 2001 and all of 2002, D.N. continued to seek to have the Hawaii custody order enforced.  Finally, on January 14th 2003, in an evidentiary hearing, Judge Isaac Anderson ordered the children to be returned to their father, However; the department refused to release the children, even when court ordered.  Seeking instead every excuse why not, they assumed jurisdiction on the basis of possession, and stated that the Hawaii ICPC compact administrator had not approved the placement of the children with D.N.  The trial court noted that the Department had not raised this issue before, stating:

> I really don't like this piecemeal stuff.  The last time we were in here on this matter Ms. Dramko [D.N.'s attorney] submitted a letter to the Court from Hawaii basically saying it was okay.  Now we've got another letter saying that it's not okay.
>
> • • •
>
> I am not for breaking up somebody's family, I am not for participating in what I consider to be what is equivalent to a kidnapping of these children from their father and brought to this part of the country.  You

27

know, it seems like the department has made hostages of these children and they don't want to give them back. Why? There's no real reason that's been posed.

The Court of Appeals further related:

The Department is charged by the legislature with providing for the care, safety, and protection of children.  § 39.001(1)(1)(a), Fla. Stat. (2001).  While pursuing this objective, the Department is to "intrude as little as possible into the life of the family, be focused on clearly defined objectives, and take the most parsimonious path to remedy a family's problems."  § 39.001(1)(b)(3), Fla. Stat. (2001).  In addition, as the Department often reminds this court, the Department is to "ensure that permanent placement with the biological or adoptive family is achieved as soon as possible for every child in foster care and that no child remains in foster care longer than 1 year."  § 39.001(l)(h).  Despite these clear directives and objectives, the Department in this case has done everything within its power to prevent the reunification of D.N. with his children for almost eighteen months, including misleading the trial court, and attempting to mislead this court, about the controlling law.

• • •

Finally, we note that the Department has come under increased public scrutiny during the past year concerning the way that it has handled, or mishandled, certain cases.  Given that scrutiny, we fail to understand why the Department chose to focus its efforts in this case on keeping the two children from a father who clearly wants them and who has a valid court order awarding him custody.  Further, we fail to understand why the Department chose not to bring the controlling provisions of the UCCJA and the PKPA to either the trial court's or this court's attention.  In making these choices, the Department strayed from its legislatively mandated objectives, and

28

its attorneys strayed from their duty to bring controlling authority to the court's attention. We trust that this opinion will assist the Department in refocusing its efforts onto those cases in which its assistance is truly needed.

## II.    MALFEASANCE OF GOVERNMENT FUNCTION

*We the People*, aggrieved children & families, hereby allege that the operation of the State of Florida in administration of the Department of Health and the Courts, in the employment, endorsement and support of the practices, principles, and industry of *Biological Psychiatry* is in gross malfeasance of government function, having caused serious damage, injury in deprivation of rights under color of law, knowingly or blindly, and is utilizing a method of entrapment and extortion through pretended (false) science endorsement of poison as "medicine", and simulated legal process. Specifically, *We the People* allege that the Florida Department of Health has failed to protect the health and safety of the people of Florida by permitting the practice of "Biological Psychiatry" as it pertains to the adverse application of chemistry against the interests of individual subjects, contrary to the WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI to act only in the interests of the patient, the NUREMBERG CODE, and the oath of Hippocrates to "do no harm".

Biological Psychiatrists, as a part of their nontheistic belief system (religion) do not believe in the redemptive capacity of the soul (mind), such as the ability to learn new behaviors well documented even in animals (monkeys, dogs, rats etc. . . .), or existence of the essence of life (spirit) but believe that mankind has evolved as an intelligent (or not so intelligent) animal, with all behaviors being genetically fixed in the DNA (*Eugenics, Social Darwinism*) and hold the profession of psychiatry to be in the interest of society at large rather than for the individual "patient". There has

never been scientific validation of these beliefs, therefore; as the Christian religion has defined "faith" (*belief*) as the substance of things hoped for, and the evidence of things not seen, the tenants of Psychiatry are presented as a religion of humanism, or beliefs presented as theory (*although never proven successful as a hypothesis*). Therefore; for the government to endorse, utilize, support and employ the irrational, unscientific, and fraudulent belief system convenient to the selling of chemicals and disabling of dissidents is the establishment of a nontheistic government religion to control the people, not at all unlike voodoo in Haiti.  [*In Haiti, when people are poisoned by prescription it is called "voodoo", in America it is called "psychiatry".*]

1.   *Welsch* v. *Likens*, 373 F.Supp. 487 (1974), Constitutional stricture against cruel and unusual punishment is not restricted solely to particular kinds of punishment, but also applies to mere confinement by conditions and practices so bad as to be shocking to conscience of reasonably civilized people. U.S.C.A. Const. Amend. 8.

2.   In *"Abuse of Psychiatry for Political Repression in the Soviet Union"* Vol. 2, COMMITTEE ON THE JUDICIARY, U.S. SENATE, 94TH CONGRESS, 2, 31; what was termed torture of dissidents, on application for political asylum, is common "psychiatric treatment" in the United States.

3.   *Accardo* v. *Cenac*, 722 So 2d 302, 97 23020 (La. App. 1 Cir. 11/6/98). Judicial notice of documented ill-effects, without medical benefit, of neuroleptic (psycho-tropic) and anti-depressants is presented to show the futility and great harm being administered (or offered as "services") to parents and children detained by the Department of Children & Family Services.

4.   Publications documenting scientific findings contrary to pharmaceutical advertisements of psycho-tropic "medications":

a.) Arif Kahn, M.D. 1900 116th Ave NE, Bellevue WA: Study of National FOIA statistics show suicide increases with use of psycho-tropics.

b.) Dr. Nora Volkow of Brookhaven Laboratories; *Mechanism of Cocaine and Ritalin is almost identical* . . . [Archives of General Psychiatry, vol. 52, p.456] also see; U.S. Subcommittee of the Committee on Government Operations, House, Hearing, 91st Congress, September 29th 1970 [p13].

c.) *Limits of Biological Treatments for Psychological Distress: comparisons with psychotherapy and placebo* – Fisher/Greenberg

d.) *Physicians Desk Reference,* PDR 58th Edition – Thomson

e.) Steve Hyman, M.D. 1996 American Journal of Psychiatry: psychoactive; psychostimulants, antidepressants, anti-psychotics work the same chronic administration of psychoactive drugs creates perturbations in neurotransmitter function which cause molecular and cellular changes in neural function [p.151] perturbations usurp normal homeostatic mechanisms within neurons (i.e. interfere with normal brain function) thereby producing adaptations that lead to substantial and long-lasting alterations in neural function [p.153] the adaptations result in addiction.

f.) *Cruel Compassion* – Thomas Szasz M.D.

g.) Leo/Cohen: *Broken Brains or Flawed Studies*? – The Journal of Mind and Behavior, Winter 2003, Volume 24, Number1 pages 29-56, ISSN 0271-0137 A critical review of ADHD neuroimaging research, spotlighting fact that shrinking brains were only found common to children subjected "medication". Historical note: for all the autopsies performed by the Nazis, they could never differentiate the "schizophrenic" brains from "normal" brains.

h.) Fred Baughman, Jr., M.D. – *"Educational 'Diseases' Fraud"*.

i.) *The Manufacture of Madness* – Thomas Szasz, M.D.

31

j.) *Against Biological Psychiatry* – David Kaiser M.D.

k.) *Suicidality, violence and mania caused by selective reuptake inhibitors (SSRI): A review and analysis* – Peter R. Breggin, M.D.

l.) *Psychostimulants in the treatment of children diagnosed with ADHD: Risks and mechanism of action* – Peter R. Breggin, M.D.

m.) *Your Drug May Be Your Problem* (1999) – Breggin / Cohen

n.) *The Creation of Psychopharmacology* – David Healy, M.D.

o.) *Mad in America* – Robert Witaker

p.) *Brain-Disabling Treatments in Psychiatry* – Peter R. Breggin, M.D.

q.) *The Antidepressant Fact Book* (2002) – Peter R. Breggin, M.D.

r.) *The Ritalin Fact Book* (2002) – Peter R. Breggin, M.D.

s.) *Toxic Psychiatry* (1994) – Peter R. Breggin, M.D.

5.   In RE: *Peter*, 108 N.J 365, 529 A. 2d 419, 425; Historically an operation without authorization constituted an assault and battery as well as Malpractice.

6.   Thomas Szasz, M.D. Professor Emeritus of Psychiatry, Article 1 of the Manifesto, published on the Internet at www.szasz.com:

*"Myth of mental illness."*

Mental illness is a metaphor (metaphorical disease). The word "disease" denotes a demonstrable biological process that affects the bodies of living organisms (plants, animals, and humans). The term "mental illness" refers to undesirable thoughts, feelings, and behaviors of persons. Classifying thoughts, feelings, and behaviors as disease is a logical and semantic error, like classifying the whale as a fish. As the whale is not a fish, mental illness is not a disease. Individuals with brain disease (bad

brains) or kidney disease (bad kidneys) are literally sick. Individuals with mental diseases (bad behaviors), like societies with economic diseases (bad fiscal policies), are metaphorically sick. The classification of (mis)behavior as illness provides an ideological justification for state-sponsored social control as medical treatment.

***Findings of Fact, Conclusions of Law and Judgment***, Cause No. 32C01-9207-JC-51, Hendricks Circuit Court, Hendricks County, Indiana, filed September 2nd 1993:

. . . " Any truly scientific claim about the causes of disease will not . . . [be based] on off-the-cuff impressions developed in the course of clinical observation . . . . This is an essential fact the courts must keep in mind so that the litigation process is not co-opted by emerging psychiatric theories not grounded in appropriate validation and based on subjective belief or unsupported speculation" – Judge Jeffery V. Boles.

*Escape of the Guilty* – Judge Ralph Adam Fine:

"Although psychiatry clothes itself in the trappings of science and seeks to influence the standards by which we decide criminal responsibility, strict reliability in its diagnosis is rare." He quotes Georgetown University psychology professor, Daniel N. Robinson as writing that those who presume to testify as experts in the related fields of psychiatry, psychology, and sociology, "do not bring to the trial a body of durable knowledge, a set of scientific laws, or even an assortment of reliable measures and procedures."

"No rule of law can possibly be sound or workable which is dependent upon terms of another discipline whose members are in profound disagreement about what those terms mean." – Chief Justice Warren Burger.

"Psychiatry can certainly not be described as a science" – Winnipeg Associate Chief Justice Oliphant 1994.

After $5,000,000,000 in sales and 1,002 deaths by December 20th 2000, the FDA has mandated the recall of Fenfluramine, Pemoline, Romozine, Duract, Posicor, Propulsid, Reezulin, and Lotronex: psychoactive "medications" the pharmaceutical companies represented as safe, and the FDA approved for short term use, pending results upon the public at large.

Some famous tragic results of "psychiatry":

Phil Hartman; Comedian/Saturday Night Live: His wife, Brynn, shot him and then herself while on Zoloft.

Eric Harris; Litteton, CO., school shooter who killed 13 while on Luvox.

Kip Kinkel; Springfield OR, school shooter, killed his parents and two fellow students and wounded 22 others while withdrawing from Prozac and Ritalin.

Andrea Yates; Texas housewife, drowned her five children while on Effexor and Remeron.

Monica Lewinsky; White House intern, Engaged in bizarre sexual activity while on Prozac, Zoloft, Effexor and Phen-Fen .

## III.    MALICIOUS (*BAD FAITH*) PROSECUTION

*We the People* (aggrieved Children & Families), assert that we have basic, common, and Constitutional rights to exist as people, free from the burdens, pains, harm, and intrusion of unreasonable search, seizure, fines, imprisonment,

34

mutilation, genocide, and any other deprivation of rights under color of law, by the following citations of authority:

When a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes expressly depriving him of jurisdiction, judicial immunity is lost. _Rankin_ v. _Howard_, 633  F2d  844, 451 US 939, 68 L.Ed 2d 326

## CONSTITUTIONAL RIGHT TO BE A PARENT CASE LAW

1.   The rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and such right is a fundamental right protected by this Amendment (First) and Amendments 5, 9, and 14. _Doe_ v. _Irwin_, 441 F Supp 1247; U.S. D.C. of Michigan, (1985).

2.   The several states has no greater power to restrain individual freedoms protected by the First Amendment than does the Congress of the United States. _Wallace_ v. _Jaffree_, 105 S Ct 2479; 472 US 38, (1985).

3.   Loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Though First Amendment rights are not absolute, they may be curtailed only by interests of vital importance, the burden of proving which rests on their government. _Elrod_ v. _Burns_, 96 S Ct 2673; 427 US 347, (1976).

4.   Law and court procedures that are "fair on their faces" but administered "with an evil eye or a heavy hand" was discriminatory and violates the equal protection clause of the Fourteenth Amendment. _Yick Wo_ v. Hopkins, 118 US 356, (1886).

5. Even when blood relationships are strained, parents retain vital interest in preventing irretrievable destruction of their family life; if anything, persons faced with forced dissolution of their parental rights have more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. *Santosky* v. *Kramer*, 102 S Ct 1388; 455 US 745, (1982).

6. Parents have a fundamental constitutionally protected interest in continuity of legal bond with their children. Matter of Delaney, 617 P 2d 886, Oklahoma (1980).

7. Parent's interest in custody of her children is a liberty interest which has received considerable constitutional protection; a parent who is deprived of custody of his or her child, even though temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection. In the Interest of *Cooper*, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980).

8. The Due Process Clause of the Fourteenth Amendment requires that severance in the parent-child relationship caused by the state occur only with rigorous protections for individual liberty interests at stake. *Bell* v. *City of Milwaukee*, 746 F 2d 1205; US Ct App 7th Cir WI, (1984).

9. Father enjoys the right to associate with his children which is guaranteed by this amendment (First) as incorporated in Amendment 14, or which is embodied in the concept of "liberty" as that word is used in the Due Process Clause of the 14th Amendment and Equal Protection Clause of the 14th Amendment. *Mabra* v. *Schmidt*, 356 F Supp 620; DC, WI (1973).

10. **Common Right:** "Unwed" biological father entitled to equal protection under the law. 1. Rejection of proposition that wrong may be done if it can be undone.

Head-note 11. The custody, care, and nurture of a child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply or hinder. *Stanley v. Illinois, 405 US 645, 651; 92 S Ct 1208, (1972).* 31 L Ed 2d 551

11. A parent's right to the custody of his or her children is an element of "liberty" guaranteed by the 5th Amendment and the 14th Amendment of the United States Constitution. Matter of *Gentry, 369 NW 2d 889, MI App Div (1983).*

12. The right of a parent not to be deprived of parental rights without a showing of fitness, abandonment or substantial neglect is so fundamental and basic as to rank among the rights contained in this Amendment (Ninth) and Utah's Constitution, Article 1 §167; 1. In re *U.P., 648 P 2d 1364; Utah, (1982).*

13. "State Judges, as well as federal, have the responsibility to respect and protect persons from violations of federal constitutional rights." *Goss v. State of Illinois, 312 F 2d 257, (1963)*

14. "Parents right to custody of child is a right encompassed within protection of 14[th] Amendment which may not be interfered with under guise of protecting public in interest by legislative action which is arbitrary or without reasonable relation to some purpose within competency of state to effect." *Reynold v. Baby Fold, Inc, 369 NE 2d 858; 8 Ill 2d 41*

15. "Santosky held that a "clear and convincing" proof standard is constitutionally required in parental termination proceedings......"Few forms of state action are both so severe and irreversible" *Santosky v Kramer, 455 USs, at 769-770*

16. "Officers of the court have no immunity, when violating a constitutional right, from liability. For they are deemed to know the Law." *Owen* v. *Independence*, 100 S Ct 1398

17. The court is to protect against any encroachment of constitutionally secured liberty. *Boyd* v. *US*, 116 US 616

# CONCLUSION

Contrary to safeguards and prohibitions of federal and state law, children and families have suffered deprivation of rights under color of law, without equal protection under the law. First priority of Family Preservation has been ignored, for procurement of financial gain, at the expense of the same children and families the law was written to protect. Jurisdiction of juvenile administrative hearings are established by fraud, as though it were a matter of due course, and "special" rules of procedure deny due process at terrible expense to financial, emotional and physical interests of victim children and families. Although mandated by law to either return the children or put them up for adoption within one year, lower court proceedings are dragged out for a year (before any appeal can be made) and the Court of Appeals takes another year to issue an opinion. [*Florida Rules of Juvenile Procedure* do not allow a stay of proceedings pending appeal, except that adoption may not occur while appeal is pending] then, after blocking all communication between family members for months and years, they (*DCF*) allege the separation as grounds for termination of parental rights. Because the quasi-judicial administrative hearings known as the Juvenile Division of Florida Circuit Courts are courts of limited jurisdiction, yet claim original jurisdiction, no declaratory relief is available to

38

counterclaims of defendant children and families; in fact the children are totally denied representation by use of "Guardian Ad Litem" mechanism which does not relay children's communication or interest, but only pretends to protect children's interest while supporting (more often than not) false allegations and interests of the "Department".

Therefore, as sovereign natural persons, aggrieved children and families, *We the People*, United States citizens, all rights intact, hereby move for a Grand Jury Trial, to judge facts and law, for a judgment against THE STATE OF FLORIDA actions by agencies, employees, agents, contractors, and public officials, committed in their individual and official capacities, that were and are outside of the character of public office, in malfeasance and misfeasance of government function, under color of law, having caused irreparable damages, adversely affecting substantial financial, emotional and physical interests of victim children and families.

For **RELIEF**, we enter the plea for writ of **HABEAS CORPUS** to issue; to locate, and return children to their natural family, without sale or delay, reimbursement for loss of time from work and the pursuit of happiness resulting from compelled proceedings; reimbursement of costs of litigation, payment of re-adjustment costs for displaced children and families, and compensation for financial, emotional, and physical damages and long term disabilities that are as a result of maltreatment in foster placement and rendering in the Juvenile Court System; specifically, a **Declaratory Judgment** against the Florida Department of Health is requested in the finding of Malfeasance of Government Function for failure to protect Health and Safety interests of Floridian children and families, with compensation to cover court ordered, drug induced dysfunction of children, for the rest of their lives, and $10,000,000 for theft (larceny) or destruction of personal family property (original and only draft of words and music written by natural father and entrusted to his son JJB) while child was detained in foster placement.

**WHEREFORE**, Plaintiffs pray that counsel of Defendant State of Florida be cited to appear and answer herein, and that after a trial, a trust account be established for compensation of injured children and families, reunification of families be mandated without delay, and other relief be granted as is sought herein and appropriate under the law and the facts.

_____    _____    _____
Phillip G. Bradshaw             Dean D. Richardson          Wayne G. Cleveland, Sr.

12530 SE 4th PL              P.O. Box 9364,              2316 Gish Lane N.E

Bellevue WA 98005         Fort Myers FL 33902       N. Fort Myers FL 33907

# CERTIFICATE OF SERVICE

I, Phillip G. Bradshaw, HEREBY CERTIFY the foregoing instrument being filed by hand delivery with the Clerk of the United States District Court for the Middle District of Florida at 2110 First Street in Fort Myers Florida, 33901, ph (239) 461- 2000, is sent by Certified Mail to: State of Florida Attorney General, Charlie Crist (850) 487-1963, The Capitol, Tallahassee FL 32399-0250, and hand delivery to the Office of the U.S. Attorney for the Middle District of Florida.

_____  2/17/04
Phillip Bradshaw, *sui juris, ex. rel. children and families*

40

# UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA, FORT MYERS DIVISION

*Children & Families* v. *DCFS*                    CASE No.:_____

# CLASS ACTION    2:O4-cv-90-FtM-29SPC

# AFFIDAVIT

I, Dean Richardson (hereafter the "Affiant" of this same instrument), do affirm, under advisement of penalty of law regarding the purposeful making of false statements or misrepresentations of fact that the following undisputed facts are of my personal knowledge and/or of record:

1.  In the month of December 1993, Lois Keating, the biological mother, left home (myself and her 4 children) in pursuit of other interests, leaving myself, a disabled veteran, to tend the physical, emotional and spiritual needs of the children.

2.  Seeking help with friends, family and Church for the filling of the need of my children for a mother figure, I was introduced to the Baptist Children's Home through my fellowship at the Church.

3.  The Baptist Children's Home was presented as a Christen environment, with Biblical precepts, operated by a husband and wife team, funded completely by the Church, with no connections to the State whatsoever.

4.  In February of 1994, I placed my son and two oldest daughters in the Baptist Children's Home, with the agreement that the Church would

1

shelter, feed, cloth and care for my children, with minimal cost to me ($10 a month), while I gathered to increase the means and where-all to provide for all the needs of my children, and that I could visit, or remove my children freely from the care of the Baptist Children's Home any time I chose to do so.

5.    The Affiant alleges, by evidence of record, that the Baptist Children's Home misrepresented the true nature of their "help", saying it was Church funded without connection to State operations, causing loss of 14th Amendment rights to life, liberty, property, due process and equal protection under the law.

6.    On February 10th 1994, Case #94-311 was opened by The Baptist Children's Home before Judge Starnes, through the Department of HRS, stating the N/F voluntarily placed his children in foster care, without informing the Affiant (N/F) of the proceeding or action.

7.    The Affiant took his son out of the Baptist Children's Home in April of 1995 to prepare for the move in June to Minnesota (where preparations were being made for all the children to be reunited and reside close to Grandmother and relatives), but the Baptist Children's Home reported the removal without ever telling the natural father of the proceeding in juvenile court.

8.    Protective Investigator Mary Marotta completed a false report (alleging the N/F was sleeping in a car with his son) May 31st 1995 without ever interviewing or contacting the natural father, and filed it as a new Case

2

#95-1457 on the 5th day of June 1995, with the help of the Child Welfare Legal Services Attorney A. M. Lang.

9. On the 7th day of June, 1995, Judge Seals dismissed the former Case #94-311.

10. Hearing on new Case #95-1457 was held without notice to the natural father.

11. A pick-up Order was issued for TWR, the 12 year old son of the Affiant, who was enrolled in school in Minnesota, living with his Grandmother and father since June of that year, without any notice ever being given to the father of the existence of any proceeding.

12. The child was abducted from school, without notification of the father or Grandmother, and transported him across several State lines to Florida.

13. Upon contacting the Sheriff's Department to report the kidnapping, the natural father was informed that the State of Florida had issued a pick-up order of the child and upon calling Florida, the Affiant was told the pick up was made, with no other information given.

14. Dependency Shelter Hearing was held without Notice to the Natural Father, with all 4 children listed on the Case, including the youngest child RDR, not yet in state custody, whose address (as all addresses and phone numbers) was already known to the department.

15. Natural Father moved back to Florida, with his youngest daughter, got a job and a residence in North Fort Myers, and began working on the Case Plan issued for TWR.

16.   TWR was given back to the Affiant in 1996, and then removed DRR and SAR, his two middle children from the Baptist Children's Home, yet having never been informed of the previous action (Case # 94-311).

17.   The Baptist Children's Home then reported the removal to the department.

18.   On Christmas night, DRR [who had a physical condition concerning her eyes and visual perception affecting her behavior (episodic discontrol syndrome, causing panic, rages and fits)] was having a fit, biting her siblings and father, with no reasoning offered from her, her siblings or the babysitter, at which point 911 was called for medical attention.

19.   Instead of an ambulance, the Sheriff's department arrived, separating the father from his children to question the children.

20.   DCF (a.k.a. HRS) Protective Investigator Howard Wright arrived, saying to incarcerate the father to facilitate removal of the children.

21.   The natural father was jailed until the first business day after New Years (January 1997), while a Shelter was held finding the children dependent, opening a new Case #96-2079, without transporting the father to the hearing, or even Notifying the father of the Hearing.

22.   No charges were ever filed against the father regarding his arrest, but a bond fee was paid for release.

23.   A Hearing was held in April of 1997, where the Affiant was notified, however his Court appointed Attorney Barbara LeGrande was incapacitated (in recuperation of major surgery) and did not represent the

4

facts of the Case before the Court, leaving the N/F without defense or access to the record.

24.    TWR a male child having reached the age of 14, was found to be not adoptable, therefore was returned to his father closing of the earlier Case #95-1457, however; the daughters where yet held under jurisdiction of the Court.

25.    Per record, DRR made many attempts to escape and resist foster placement, RDR was unwittingly placed in Foster America's care by the N/F false impression that it would save her from DCF, but then Foster America adopted her out without supplying the paperwork to the natural father, who had petitioned for an open-adoption.

26.    While in convalescence, recuperating from hospitalization, a hearing was held on SAR, without notice to the N/F, wherein an Order of Default issued and Parental Rights Terminated, but after Barbara LeGrande confessed to having not told her client of the Hearing, a new attorney and Hearing date was arranged, however the Hearing was held before the established time and the Order of Default was issued again, even though the N/F was present at the appointed time, as witnessed by the Guardian Ad Litem and the Bailiff.

27.    To restrain and in attempt to control SAR, State of Florida contracted Psychiatrist Frederick W. Schaerf M.D., Ph.D., P.A. administered the amphetamine like methylphenidate hydrochloride "Ritalin" and the neuroleptic risperidone "Risperdal".

5

amphetamine like methylphenidate hydrochloride "Ritalin" and the neuroleptic risperidone "Risperdal".

28.   DRR was told she did not have any parents anymore, so she accepted adoption placement but drove the placement to bankruptcy through her delinquency.

I, Dean Richardson, the Affiant of this affidavit affirm that these children never had any problem with the law before the intrusion of DCFS, and that all these facts presented are without controversy as undisputed truth.

_Dean Delano Richardson_

Dean Delano Richardson, P.O. Box 9364, Fort Myers FL 33902

Dean Delano Richardson, having exhibited _Paso Part for I.D._ for identification, (or is personally know by me) did sign this affidavit on the _14th_ day of _January_ 2004, having affirmed the truthfulness of the foregoing information under oath before me _____ a Notary Public.

_Seal._

HORACE SMITH
Notary Public, State of Florida
My comm. exp. Aug. 17, 2007
Comm. No. DD 241961

## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA, FORT MYERS DIVISION

*Cleaveland v. Florida*

# AFFIDAVIT 2: 04 -cv- 90 -FtM-29.SPC

I, Wayne L. Cleaveland, first being duly sworn, depose and make under oath the following affidavit of true facts regarding the actions of the Florida Department of Children & Family Services in District 8, Lee County Florida:

1.  My daughter, B.L.C. was born on March 22nd 1989; the true name of her mother is Darrellene Stilles.

2.  After 3 years of living together before the pregnancy, and our child having been born, the natural mother, who had told me her name was Kim, informed me that her name is Darrellene, and that she was a fugitive from the law, and did not want to raise our child. She signed a release and promissory note for $75 dollars a week in child support, saying that I was a good man, and that she wanted me to raise our daughter by myself.

3.  Darrellene Stilles left without any further contact or child support payments being made.

4.  After requesting assistance in child support collection, HRS (now known as Department of Children & Family Services) took my daughter B.L.C. away from me, stating that they wanted me to sign an affidavit swearing that I

1

was not the father of Darrellene's other child, and after signing the paper, Michelle Gregory took my 1year old baby girl from me.

5.     Appearing *sui juris* at the Dependency Shelter Hearing, I was confronted with the department allegations of being unfit, of my house being trashed, and there being no food or diapers for BLC.

6.     On cross-examination Mr. Gregory didn't know the address of my house.

7.     In defense, witnesses were offered to testify that there was indeed food, clothing, and diapers in my very clean house.

8.     The Judge ordered Mr. Gregory to give BLC back to me.

9.     After a week, instead of return of my daughter, HRS workers told me I had to go to parenting classes, which I did four weeks of, and then worried something might have happened to my daughter, I called Senator Connie Mack on Thursday of the 5th week.

10.    Senator Connie Mack heard my story and told me that if I didn't have my little girl back by the following Monday at 12:00 noon, to call him back.

11.    The next day Mike Gregory came to my house and left his card and told me to be at the HRS office at 11:00 a.m. Monday to pick up my baby.

12.    That Monday, I watched Mr. Gregory take my baby out of a car (with no restraint seat) and then I met him at the office.

13.    Mike Gregory told me, in a very threatening manner, that he had been taking children from their families for ten years, and could count on one hand how many went back to their original family, and that he was going

2

to get my little girl from me one way or another.  I warned him not to come near my daughter again, went home without anymore trouble for a few years.

14.   In 1994, I met a woman that now wears the name of Robin Tifft Turner, who after a few months said she wanted to move in with my daughter and I to live as one happy family, which we did for $2^1/_2$ years, and then we decided to get married and have a child.  Robin Tiff Turner also attempted suicide on two different occasions in front of my son, and was sent to a mental health hospital, but released for lack of funds.  She still talks about suicide and killing herself.

15.   Before my son was born, my daughter told me that Robin was beating on her, so I confronted her, she denied it, but started acting irrational, and left for her mother's house (without a word of explanation) with our son WLC Jr., the day after he was born.

16.   When I called, she told me not to call again or that she would get an Injunction against me.

17.   I hired an attorney and contacted HRS, who said I should get my son because I have a house and my son's sister, and more suitable because I worked and Robin didn't.

18.   After 86 days passed, while I was waiting to see if she would return to me, she put the Injunction against me stating that I hit her with a T-shirt, which I denied.

3

19. I was ordered to go to counseling, that after completion I would receive my son.

20. Although I passed the class with flying colors, my son was placed with his mother.

21. BLC cried for her brother for many months.

22. After attaining parental custody of WLC Jr., Robin married Adam Turner and had a son by him.

23. After four years, she divorced Mr. Turner with false allegations, and was awarded $175 in child support payments to be made in addition to the $40 dollars a week that she receives from me.

24. Robin now has an older man named Ron "Hugeett" (the father of Adam Turner) living with her and my 6year old son, although Ron is a convicted felon with an arrest record five pages long (including 20 months for stabbing a boy in the chest three times).

25. Although I complained for the safety of my son, and reported being threatened with a knife, the man still lives with her and my son, DCFS doing nothing to protect my son from danger, although I have pictures of bruises and negatives of orgies going on in the house. Robin stated that she had friends working within the department.

26. Judge Nelson issued the Order for a police escort to help me pick up my son, but Mike Gregory who was in charge of the Domestic Violence Department at the time, told the lady who was typing up the Order to

change it to delete the service, so the police could not help me to pick up my son.

27.    Robin was court ordered to get a job, but after 4 years and another child born to another man, she says she can't work because she has children to take care of.

28.    On March 17th 2001 I entered into a contract of rent to own for 40 acres of water front property of the river, which my children loved, and was enjoying it together with them until a neighbor became involved.

29.    One evening the neighbor (named Ty) stayed late and drank too much beer. I told him to go home because I did not want him around my house drunk, and that I would take his children home to him in the morning. I fell asleep before he finished his last beer, and when I woke up about 2:00 a.m., I found him dry humping (with all his clothes still on) the bed while my daughter, who was awake and fully clothed was sitting up very frightened and staring at me.

30.    I put him out the door, and threw him outside by the neck and called the police who told me I could do nothing about it unless it happened a second time.

31.    2 weeks later he came back again to apologize, and I told him I did not care, that I did not want him near my children and not to come back. He attacked me from behind, and we fought for what I estimate as an hour.

32.    After he left, I had BLC to call an ambulance the next morning to take me to the hospital.

33.    The hospital called DCFS (a.k.a. HRS) saying my face looked like hamburger.

34.    DCFSd8 Protective Investigator Mark Richardson arrived and asked if I had a place for my 12 year old daughter to stay while I was in the hospital, and I gave him the number of my babysitter Chrissey Breeze, who is a DCFS approved Safe House Care Giver, but Mr. Richardson said he couldn't get through, and that he would take BLC to a shelter for the night.   I told him not to, because I would not be in the hospital overnight.   The Mr. Richardson said he would return BLC the next day, and to just call if I was released that same day.

35.    That same day I was released, not having to spend the night, and called Mark Richardson who told me there would be a court hearing within two days, and if I did not attend, I would not see BLC again.

36.    Mark Richardson gave me the wrong courtroom information, where I waited for three hours, and was then informed by an officer that I was in the wrong place.   When I arrived at the correct location, Richardson laughed at me while I was told the Hearing was over, and that there was nothing that I could do about it.

37.    Upon hearing of the situation before 4 Officers, Judge Corbin told me to come back the next day.

38.    I returned the next day at the expense of my job, which I lost for too much time lost to the court.

6

39. At the "Hearing" Judge Corbin accused me of starting trouble, and told me to go to five different counseling programs, including A.A., Domestic Violence, Parenting Classes, etc. . . which would amount to about $1500.00 and I said that I would not, he said I would or that he would put me in Jail for 5years.

40. I reported the incident to the State Attorney, who had Judge Anderson replace Corbin on my Case, and had an Injunction and a Restraining Order put against Ty Desharm (the neighbor).

41. After 4 weeks, I saw a friend of my daughter, who knew her from school. She said BLC escaped from the shelter after another girl being detained by the department pulled the fire alarm after 4 days of detention.

42. At the Sheriff's office, I asked if anyone had reported her missing, and they said no, so I filed a missing persons report.

43. I went back to the girl's house and asked why my daughter didn't return to me, and was told that BLC had been told by Mark Richardson that if she ran away and was found with me, her natural father, that she would be put in a reform school and that I would be put in prison for 5 years, therefore BLC was hiding out from everyone.

44. Then Robin Turner, the mother of my son, began to file false allegations against me, at which point the juvenile court appointed Barbara LeGrand to "represent" me, but she only told me to do whatever I was told and I kept on saying I would not because the allegations were false.

45.    After 8 months of being called to court once or twice a week, only to be postponed until the next time, 9 months from the beginning of the ordeal, Judge Anderson Ordered the return of my daughter.

46.    That Saturday at noon BLC was returned to me 13 years old and 7 months pregnant.

47.    BLC told me about the abuse she suffered in foster placements, and also told me that a DCFS woman took her out of a foster home and took her to the Stockade to talk to Ty Desharm (the man I had a restraining order against) who was not in jail for molesting her, but for other reasons.

48.    13 year old BLC told me that 32 year old Ty Desharm was the one who got her pregnant.

49.    BLC said she ran away because she was scared for her life, and when she came home, I was gone (when I lost my job I could no longer afford the property) but Ty, who lived next door said I had left the state, so he took her to New York City, where he raped her.

50.    BLC had received no pre-natal care while in Foster placement, but was given dubious pills, which she spat out when no one was looking.

51.    1 week after the baby was born, I was contacted by Child Support Enforcement Officer Vernen Fairchild on back pay for $168.00 to an Administrative Hearing.

52.    At the Hearing I said that my income tax return was for $2500.00, and that the $168.00 could be taken out of that.

53.    The I.R.S. Attorney for child support enforcement Vernen Fairchild then stated "O.k., we'll take it all, and then put a warrant for your arrest and put me in jail, then when you get out you'll have to pay $380.00 in 6 weeks or be put in jail again."

54.    I knew that a hearing officer was for a civil matter, and not for a criminal proceeding, and did not have a right to put me in jail, so I figured the DCFS (a/k/a HRS) was involved in this act of malicious prosecution.

55.    My entire tax return was withheld from me, $2500 which was to be spent putting a roof over our head, and the Department of Motor Vehicles suspended my class "A" CDL with all endorsements including Haz.-Mat., which cost me $5000 to go to school to get, which is my only means of gainful employment.

56.    After litigation, I was told that if I paid $1000, I could get my license back, but no return of the remainder of the income tax return.

57.    I was paying $100 a week for us to stay in an HRS approved shelter, also a friend of mine Chrissy Breeze's house, but when BLC found out that the department was again seeking to force further proceedings, she ran away, and was later seized by the department and detained in Port Charlotte.

58.    Court appointed Attorney Barbara LeGrand offered to the court that (with CDL restored) I was able to make $50,000 a year, and was capable of taking care of all three children.

59.   Now I am only able to work out of a labor pool for bare survival wages, but I am eligible for a V.A. loan to purchase a house for my children, and could again be gainfully employed once my License is restored.

**I UNDERSTAND** that any false statement(s) of a material fact contained herein may serve as the basis of prosecution and conviction for perjury or making false statements. **FURTHER, I CERTIFY** that all statements contained herein are true and correct to the best of my knowledge and belief.

_____
Wayne L. Cleaveland, in proper person *sui juris*;

STATE OF FLORIDA

COUNTY OF LEE

The forgoing Instrument was acknowledged before me this 17th day of January 2004, by Wayne L. Cleaveland, who is personally known to me or who has produced n/a, as identification and who did take an oath.

TINA MASTRANDREA
MY COMMISSION # DD 137907
EXPIRES: July 30, 2006
1-800-3-NOTARY  FL Notary Service & Bonding, Inc.

_____
NOTARY PUBLIC

My Commission Expires: 07/30/2006

10